UTICA FIRE ALARM TELEGRAPH CO. *v.* WAGGONER' WATCHMAN CLOCK CO.

1. CORPORATIONS — STOCK SUBSCRIPTIONS — LIABILITY OF STOCK-HOLDERS.
   Where stock was issued to incorporators of a company for property and assets, including a patent, bills receivable, and furniture, valued in good faith at $15,000, the widow of one of the original incorporators who received his stock on distribution of the estate of the deceased stockholder, was not liable to contribute towards the payment of corporate debts.

2. SAME.
   Stockholders, who obtained unissued stock of the corporation at twenty-five per cent. of its par value, knowing that it was not a going concern, and needed funds to enable it to do business, were rightly decreed to pay the difference for the benefit of creditors of the insolvent company.

3. SAME—GOING CONCERN—WORDS AND PHRASES.

An agreement with another concern, permitting the latter to manufacture and sell the products which the corporation purposed to produce, did not constitute it a going concern.

4. SAME—CONTRACTS.

Under a contract of subscription stipulating that stock issued to defendants should be "fully paid and nonassessable when twenty-five per cent. has been paid" the stockholders who were in default in contributing the agreed amount were also liable to pay the remainder required to bring their subscription to the par of the stock.

5. SAME—OFFICERS—SALARY.

A claim filed by one of the stockholders for salary for services performed in the office of the corporation was properly disallowed on the hearing, in the absence of any formal action of the corporation allowing him a salary, and any entry on its books crediting him with the same, his testimony that one of the directors arranged to pay him the salary being contradicted by the director.

6. SAME—CREDITORS—SUBROGATION.

Nor did the court err in disallowing the claim of such stockholder to share in the fund created by the payment of the stock in full, upon a corporate note which he had indorsed and paid to the bank, to whose rights he asked to be subrogated, since he had knowledge of the terms of issuance by the corporation of the stock; but the decree rightly allowed his claim as that of an ordinary creditor that was not misled by the issuance of stock below par.

7. SAME—STOCK AND STOCKHOLDERS—SET-OFF.

It is contrary to public policy to permit a stockholder to off-set against his liability for such unpaid stock an indebtedness due from the corporation to him.

8. SAME—DECREE—CREDITORS' SUIT.

The court rightly decreed that the stockholders should pay the creditors of the corporation which owed less than the amount payable on the stock held by them, in the proportion of their several holdings.

9. SAME.

Services rendered to a corporation in payment for stock must be reasonably commensurate with the par of the stock, or creditors may attack the transaction.

10. SAME.

   A director and president of the corporation, who transferred his
      stock to an irresponsible purchaser, knowing the financial
      difficulties of the corporation, which was insolvent at the
      time of transfer and whose transfer book did not show the
      sale, was correctly held to have acted in bad faith, and re-
      quired by the decree to pay the balance due on his stock.

11. SAME—NOTICE.

   That the purchaser took the stock in his name as agent, paying
      only one per cent of the par in cash, the remainder in quar-
      terly installments, and that he told the seller he could not
      pay the price in full, justified the court in finding that the
      seller knew of the purchaser's insolvency.

Appeal from Kent; Lamb, J., presiding. Submitted
February 27, 1911. (Docket No. 114.) Decided Septem-
ber 29, 1911.

Creditor's bill by the Utica Fire Alarm Telegraph
Company against the Waggoner Watchman Clock Com-
pany, Edward M. Deane, and Christian Bertsch, to en-
force stockholders' liability. By cross-bill Annie V.
Sears, Albert E. Waggoner, and W. B. Waggoner were
brought in as parties. From a decree dismissing said
cross-bill and awarding relief to complainant, the defend-
ants appeal. Affirmed.

   *George C. Brown*, for complainant.

   *Cleland, Heald & Montgomery*, for defendant Deane.

   *Smedley, Hall & Gillard* (*William E. Grove*, of
counsel), for defendant Bertsch.

McALVAY, J.  A judgment creditor's bill was filed by
complainant, on behalf of itself and other creditors, against
defendant company and three stockholders, Edward M.
Deane, Christian Bertsch, and Eugene A. Hamilton, for
the purpose of winding up the affairs of defendant corpo-
ration, and to enforce the unpaid stock subscriptions of
certain stockholders.  The bill asked for a receiver and an
injunction.  The bill was taken as confessed against de-

fendant corporation.   The individual defendants filed sep-
arate answers.   The answers of defendants Deane and
Bertsch were in the nature of cross-bills, asking that other
stockholders be made parties, and for affirmative relief
against them.   Of these parties but one, Annie V. Sears,
the widow of one of the original incorporators, answered
the cross-bills.

Defendant corporation was organized December 23,
1899, under Act No. 232, Pub. Acts 1885, with an authorized
capital of $50,000, of which $15,000 appears to have been
subscribed by the incorporators, Austin K. Wheeler, Al-
bert E. Waggoner, and William B. Waggoner; each tak-
ing 500 shares.   This stock was paid for by turning in the
good will and assets of a partnership of the same name,
composed of Mr. Wheeler and A. E. Waggoner.   The
assets consisted of some accounts receivable and stock on
hand, all of the value of about $800, and a patent for the
clock which the corporation was organized to manufacture.
Mr. Wheeler died January 15, 1900.   Later his stock was
assigned as part of his estate to his widow, the cross-bill
defendant, Annie V. Sears.   Before the incorporation,
the partnership had done some business in manufacturing
and selling about 15 clocks.   The three incorporators were
equal partners.   The record of the meetings of the com-
pany shows that between the date of incorporation and
Mr. Wheeler's death nothing had been done, except to
elect directors and officers, and making an agreement with
a party to get subscriptions to stock.   At the first annual
meeting, held December 22, 1900, the following was re-
corded:

"The business of the company being in a state of sus-
pense, owing to the inability of Judge C. W. Perkins to
dispose of the stock as per agreement, and that no other
arrangements had yet been made to carry on the business
of the company.   An effort is being made to secure sub-
scriptions to the stock or part of it, and until this is ac-
complished there can be no business conducted.   *   *   *
There being no business before the meeting, it was duly
adjourned."

On March 15th following, an arrangement was made with the Michigan Vapor Stove Company to manufacture clocks for 50 per cent. of the profit; the remaining 50 per cent. to be paid A. E. Waggoner as a salary for selling. This was done because "it was impossible for the company to do business, owing to lack of clocks."

At this meeting it was agreed to offer defendant E. M. Deane stock to the amount of $3,000 "in consideration of his disposing of the stock and putting the company on a safe financial footing." The record of the annual meeting of December 22, 1901, shows only that the agreement with the Vapor Stove Company was being carried out, and the following:

"There can be no business done by the clock company itself until such time as enough stock is sold to enable the company to be placed on a proper financial basis."

On the same day a written memorandum of a meeting shows that it was agreed to issue to defendant Deane 300 shares of stock, to be held in trust, conditioned that if he was unable to dispose of stock as agreed the certificate was to be canceled.

On January 21, 1902, at a meeting of the stockholders—

"The following proposition was submitted by Mr. E. M. Deane: He and his associates agree to take $10,000 of the stock at 25 cents on the dollar, full paid and nonassessable. He further agrees that if more money is needed to carry on the business than the $2,500 realized from the sale of the $10,000 of stock he will sell enough more stock as may be considered necessary by the board of directors, at not less than 50 cents."

The record of the meeting shows that the proposition was accepted, and that it was agreed to issue $3,000 in stock to him, when the $10,000 in stock was issued to him and his associates. On March 3, 1902, the said stock was issued as follows: $5,000 to defendant Deane; $5,000 to defendant Bertsch, being 500 shares each of the original unissued stock of the company; and to defendant Deane there was also issued 300 shares of the same original stock,

the consideration for which was selling $10,000 of stock, at 25 cents on the dollar, and such other stock as might be necessary to put the business on safe financial footing. Both these defendants knew the kind of stock they were getting, and that the money they were to pay in constituted the capital upon which the company would commence business. Deane paid $300 when his $5,000 stock issued, and $700 later. He has never paid the balance of $250. Bertsch also paid $300 when his stock issued, and later small payments amounting to $600. He has never paid the balance of $350. The defendant company, with the $600 cash paid in by Bertsch and Deane, began business operations in March, 1902. Bertsch was immediately elected a director and president. Deane was also elected director and treasurer, and was manager of the company for a year or more, and had charge of the books to May 1, 1904. These two defendants managed the financial affairs of the concern. It will not be necessary to state in detail all that occurred in this business. Frequent statements of the condition of the business were gotten out, from which it appears that it never was successful. Defendants Bertsch and Deane were active in its interests.

Bertsch sold his 500 shares of stock to defendant Hamilton, in January, 1905, in consideration of $50 in cash, a note of $1,000 payable in quarterly installments of $100 each, and taking up two company notes at the bank, amounting to $1,100, indorsed by Bertsch, which Hamilton paid with his wife's money. The notes were taken up for her, and she now holds them against the company. The stock was issued to E. A. Hamilton, agent, so that his creditors could not reach it. Hamilton already had 50 shares of the stock issued to him at the time of the issue of stock to Bertsch and Deane, and apparently in good faith for a sufficient consideration. When he purchased the Bertsch stock, he understood that he would be secretary and treasurer of the company. He was insolvent at the time. None of the other stockholders knew of this

transfer of stock at the time, and it was never entered upon the record book of the corporation.

Defendant Deane has filed a claim for unpaid salary at $50 per month, for a year or more, and a claim of $1,031.60 for money paid by him on a note of the company.

Service of process was never had upon the two Waggoners, who lived beyond the jurisdiction and were insolvent. Therefore, on motion, the cross-bills were dismissed as to them.

A hearing was had upon the issues joined upon the bill and cross-bills. The court made an extended finding upon the facts, and granted a decree in favor of complainant and against the corporation and defendants Bertsch and Deane. The bill of complaint was dismissed as against Hamilton without costs. The cross-bills of Bertsch and Deane, as against defendant Annie V. Sears, were dismissed, with costs in her favor. The defendant corporation was dissolved. Defendant Deane was held liable to pay $250, with interest, being the balance unpaid on his agreement to purchase $5,000 of the stock at 25 cents. Defendant Bertsch was also held liable to pay $350 and interest on his purchase of stock. Defendant Deane was further held liable to pay $6,000, with interest, being the balance unpaid on his $5,000 of stock purchased at 25 cents, and $3,000 of stock given for selling stock, less $750 allowed. The transfer of his stock by Bertsch to Hamilton was held to have been in bad faith, with intent on his part to escape liability, when the company was known by him to have been in a failing condition and Hamilton an insolvent, and he was decreed to pay $3,750, the balance unpaid on his $5,000 of stock. The claim of Deane for salary was disallowed, and his claim of $1,031.60, for money paid for defendant company, was allowed, to be paid out of the general assets, and not allowed to participate in the trust fund. The battery patent and the magneto patent were decreed to be the property of the corporation and part of its general assets. Other provisions of the decree, which refer to a distribu-

tion of assets and the proportions to be paid by Bertsch and Deane, and matters of costs, need not be stated.

Defendants Deane and Bertsch have appealed, and claim that in all respects, as far as liability on their part was decreed, the court was in error, except as to the matter of the balance due on their purchases of 500 shares of stock each, at 25 cents on the dollar, which one actually and the other inferentially insists they should be decreed to pay.

We will first consider the question of the liability of Mrs. Sears. One of the appealing defendants urges that she, having acquired this stock through the distribution of her husband's estate, is liable to the same extent his estate would have been liable, and that he never paid anything upon the 500 shares of stock he took upon the organization of the corporation. The record is clear and undisputed that the corporation was organized by the members of the old copartnership of the same name, who turned in all of its assets, and each took therefor 500 shares of stock in the corporation. It is true that the records and books of the company do not show the transfer and acceptance; but it is clear that these assets, consisting of a few hundred dollars, some bills receivable, some furniture and fixtures, and the patent under which they intended to manufacture the clock, were all the assets the corporation received. The value fixed upon these assets was $15,000, and upon that valuation the stock was issued. The patent was assigned to the corporation later. The finding of the court that this stock was issued in good faith for a sufficient consideration was warranted by the evidence, and the conclusion dismissing the cross-bill against Mrs. Sears necessarily followed.

The contentions of defendants rest to a certain extent upon the claim that this corporation was a going concern at the time they purchased its stock. In our opinion, the evidence contained in this record does not sustain such contention. In law this corporation was an entity; but

166 Mich.—40.

its stockholders at the first regular annual meeting solemnly declared and recorded that it was not doing business, and could not do business, until stock was sold and money realized from such sales. Defendants Deane and Bertsch both knew that the money paid in by them on the purchase of stock was for the purpose of starting business. The company, on December 23, 1899, when organized, had about $200 and some small amount of material. It afterwards manufactured 15 clocks. Wheeler died within 30 days. The agent selected for that purpose sold no stock. Owing to this fact, at the end of the year 1900, "the business was in a state of suspense," and the stockholders declared, relative to selling stock, "until this is accomplished, there can be no business conducted." Written in red ink, upon the sworn annual report by the directors of the condition of the company for the year 1900, made February 27, 1901, was the following:

"Since the death of A. K. Wheeler, January 15, 1900, the business of this company has been practically at a standstill."

March 15, 1901, the stockholders met, and because "the financial arrangements not having been concluded, whereby the company could carry on its business, it was unanimously agreed to accept the proposition of the Vapor Stove Company," stated above, and at this meeting it was voted to offer defendant Deane $3,000 in stock "in consideration of his disposing of the stock and putting the company on a safe financial footing." At the annual meeting following (December 22, 1901), it appears that the same conditions continued. On the next day, at a meeting of the stockholders, it was unanimously voted to issue 300 shares of stock to Deane, in trust, upon the understanding "that in case he was not able to dispose of the stock of the company as per the minute of March 15th, *supra*, the stock is to be canceled and returned to the treasury." On January 21, 1902, Deane submitted his proposition to a stockholders' meeting, as follows:

"He and his associates agree to take ($10,000) ten thousand dollars of stock at (25c.) twenty-five cents on the dollar, full paid and nonassessable. He further agrees that if more money is needed to carry on the business than the $2,500 realized from the sale of the $10,000 stock he will sell enough more stock as may be considered necessary by the board of directors, at not less than (50c.) fifty cents."

This original stock, never before issued, was issued to Deane and his associate, Bertsch, March 3, 1902, and at the same time $3,000 in stock was issued to Deane under his agreement. Some of this money was paid at once by these defendants; each paying $300. As already appears, it has never been fully paid.

The arrangement with the Vapor Stove Company was not carrying on a business by the corporation. It was a permission granted to the stove company to manufacture and sell these clocks. The record is undisputed that the corporation was not, during this time, continuing to prosecute its business with the prospect and expectation of still doing so. Nor was it being carried on as a whole and with some particular object in view. Nor was it continuing to transact its ordinary business necessary to fix its status as a "going concern," as judicially defined by the courts. Vol. 4, Words and Phrases, p. 3103, citing *Corey* v. *Wadsworth*, 99 Ala. 68 (11 South. 350, 23 L. R. A. 618, 42 Am. St. Rep. 29); *Oliver* v. *Lansing*, 59 Neb. 219 (80 N. W. 829); *White, Potter & Paige Manfg. Co.* v. *Importing Co.* (C. C.), 30 Fed. 864, 865.

In addition to other evidence, the testimony of both these defendants shows a knowledge of conditions when they purchased their stock. Deane testified that the proposition contained in the minutes of March 15, 1901, as set forth, was made by him; that he had investigated the finances of the company before he undertook to sell stock, and knew it was in a pretty bad way. He said he knew the clock company was not doing anything. He also testified:

"*Q*. Mr. Bertsch knew—you told him what the condition of the company was when he came in?

"*A*. I did.

"*Q*. That they were wanting capital to start their business?

"*A*. Yes, sir.    *    *    *

"*Q*. You understood you were getting a part of their unissued capitalization didn't you?

"*A*. Yes, sir.

"*Q*. Did you give Mr. Bertsch to understand the same thing?

"*A*. Yes, sir; Mr. Bertsch and I came in at exactly the same time.   It was all one transaction, and he understood as much of the conditions at that time as I did."

Defendant Bertsch testified that he purchased through Deane's efforts, who said he expected to raise money enough so "we could get the company going." He testified further:

"*Q*. When you came into the company, you knew the company was not doing business, didn't you?

"*A*. I did.

"*Q*. And you knew that the money that you and Mr. Deane were paying in was for the purpose of financing the company, so that it could go ahead and do business?

"*A*. That was the understanding.

"*Q*. You knew that the company had no other property at that time besides these patents, didn't you?

"*A*. Well, I didn't suppose they had."

It would appear that this testimony of these defendants was conclusive upon them as to their knowledge of the conditions at the time they purchased their stock, and also as to what use the cash paid in by them was to be put. The contention of these defendants is that this was a going concern, which required additional capital, and that the stock was purchased by them in good faith for its actual value, and the creditors cannot call upon them for the difference between the sum paid and par value of the stock.   We think that it already sufficiently appears that the facts in the case do not support such contention.

In *Rickerson Roller-Mill Co.* v. *Machine Co.*, 75

Fed. 554, 23 C. C. A. 302, the question here presented was considered by the court. The facts upon this proposition were similar to those in the instant case, and the contention the same. The case is from the western district of Michigan. Judge Lurton, speaking for the court, said:

"Neither is this the case of a going corporation, whose capital stock had become impaired or diminished by losses or misfortunes. It is true that in some sense this corporation had been doing business in a small way for a month or more before this new stock was issued; but there is no evidence that its capital stock had been impaired by losses. Upon the contrary, the Messrs. Fox were admitted as shareholders in consequence of the necessity for increasing the capital stock of the company, and enabling it to begin the business for which it had been organized. Their purchase of these shares was in accordance with the original scheme of the promoters, and they were bought as an investment in a manufacturing corporation which had not yet acquired a plant, or begun the business for which it had been organized. The arrangement by which they were to buy these shares from the corporation, and pay but 50 per cent. of the par value of the stock, was subject to the contingency that they would be liable, in the event of the insolvency of the corporation, to creditors who should become such in ignorance of the arrangement, and who had a right to suppose that this increased stock had been paid in full, or was subject to call. The stock taken by Rickerson and his original associates stands upon a very different footing. That was issued in payment for the Rickerson patents, upon a value estimated by the parties to be fair and reasonable. When full-paid stock is issued by a corporation having power to receive property in payment for stock subscriptions, there must be actual fraud in the transaction to authorize creditors of the corporation to call upon the subscriber for the difference between the actual value and that at which it was received."

In this opinion the learned judge distinguishes the cases relied upon by defendants in the case at bar. The case is a well-considered one, and an exhaustive footnote digests the authorities upon the subject of "Stockholders' Liabil-

ity to Creditors of Corporations in Equity, and the 'Trust Fund' Doctrine."

In the case under consideration, there is another and sufficient reason why they cannot claim exemption from liability upon the unpaid balance of stock purchased. The contract of purchase of this stock was explicit that the "same shall be fully paid and nonassessable when twenty-five per cent. has been paid." This has never been performed by these defendants. It is undisputed that each is in default and neglected to pay on demand. Both were properly held liable to pay the difference in full between the amount paid and par upon the stock so purchased. So far the defenses of defendants Deane and Bertsch have been identical and considered together. Separate consideration must be given to the further objections of each to the decree appealed from.

Defendant Deane has filed a claim for salary for services performed in the office and about the business, by virtue of an understanding with Mr. Waggoner, one of the directors. This is denied by Mr. Waggoner, and the records and books show no credit for salary to him. Claimant admits that there was no formal action of the corporation allowing him a salary. No claim was ever made for a salary prior to filing his answer in this case. The court denied the allowance of the claim. The evidence upon the subject does not warrant us in holding that under the circumstances there is a presumption that it was intended by the parties that such services would be paid for. In fact, the record negatives such a presumption. This charge was evidently an afterthought, and was properly disallowed. *Notley* v. *First State Bank*, 154 Mich. 676 (118 N. W. 486).

Defendant Deane also claims that the court should have allowed his claim of $1,031.60 for money paid to bank on note of the company indorsed by him to participate in the distribution of the so-called trust fund, and that he should be subrogated to the rights of the bank. Under the circumstances, may he who became a creditor, after full

knowledge of the terms of sale of this stock, participate in the fund created by requiring the stock to be paid in full? An ordinary creditor with such knowledge would have no such right, for the reason that the want of such knowledge is the basis of the right on the part of a creditor to require full payment for such stock. 1 Cook on Corporations (6th Ed.), § 199. This principle was involved in *Rickerson Roller-Mill Co.* v. *Machine Co., supra.* The defendant, a stock purchaser, who was a party to the transaction of purchase for less than par, on becoming a creditor, can claim no greater equities than an ordinary creditor. Nor can he be subrogated to the rights of the bank by reason of his knowledge of conditions. The court properly excluded this claim of defendant Deane from participation in this fund.

It is the contention of defendant Deane that he is entitled to set off this claim against the amount due on his subscription of stock. It appears to be well settled that to allow such set-off is inequitable, and against public policy. 1 Cook on Corporations, § 193; *Scovill* v. *Thayer,* 105 U. S. 143.

Of the amounts the defendants Bertsch and Deane were held liable to pay, the court below directed the receiver to collect from them only an amount sufficient to pay the debts of defendant company remaining unpaid in a proportion of eight-thirteenths from Deane and five-thirteenths from Bertsch. The correctness of this apportionment does not appear to be disputed. The amount of claims proved against the company was fixed at only $3,383.20, while the liability of these defendants, as found by the court, is almost three times that amount. They were the only defendant stockholders contributing, and stood upon the same footing, each with full knowledge of financial conditions, and that the other's contract with the company to buy stock at 25 per cent. of its par value was like his own. Defendant Deane would therefore have no equitable right to participate in this fund so created to satisfy

his claim, thereby compelling defendant Bertsch to pay five-thirteenths of it.

Defendant Deane urges that the portion of the decree which determines that he is liable to pay on the $3,000 worth of stock which he received for services in selling stock to the amount of the difference between what his services were found to be reasonably worth and par, being $2,250, should be reversed. He claims that this stock was issued to him in payment for his services performed in good faith in selling $10,000 par value of stock, under an agreement that he was to receive $3,000 par value of stock, and that under the authorities he cannot be held for any unpaid balance on it. In other words, that it was fully paid and nonassessable as issued. This court has recognized the rule contended for, with the modification usually embraced in it, as follows:

"It is conceded that services rendered to a corporation in good faith constitute a good consideration for the purchase of stock. * * * Such services, however, must be reasonably commensurate with the par value of the stock subscribed; otherwise such purchase is void as to the public and creditors." *Peninsular Sav. Bank* v. *Stove Polish Co.*, 105 Mich. 535 (63 N. W. 514).

The court below found that such services were reasonably worth $750. We cannot say that this was unsupported by evidence. Defendant Deane made this purchase with the full knowledge he had in purchasing $5,000 worth of the same stock on the same day. In our opinion, the value of the services performed by him as found by the court were not "reasonably commensurate with the par value of the stock." We find no sufficient reason why he should not pay the balance on this stock the same as we have held he should on the other stock purchased by him at the same time.

Defendant Bertsch urges as a reason for reversal of the decree against him that the court was in error in holding that the transfer of his stock, on January 3, 1905, to defendant Hamilton was not made in good faith in the reg-

ular course of business, but was made with a view of escaping liability, knowing that the company was insolvent, and knowing that Hamilton was insolvent, and contends that from the record the contrary of each of such findings was true. Unless his contention in respect to this matter of a good faith transfer of this stock to Hamilton is sustained, from the determination we have already made upon his other contentions, the decree against him must be affirmed.

We have already found that when he purchased this stock he did so with full knowledge that the corporation was not a going concern, and that it could not do business without money from the sale of stock, and that the money paid in by Deane and Bertsch was to be devoted to that purpose, and we have held that under the facts he was liable to pay the unpaid balance on such stock. The record shows that at once after he became a stockholder he was elected a director and president, which offices he held up to the time of the transfer to Hamilton. It also shows that all the financial business of the company was done by Deane and Bertsch; that defendant Bertsch attended the stockholders' meetings, and saw the annual reports and knew their contents; that he had indorsed the company's note at the bank, which the company was unable to pay; that he refused to indorse further, and Deane indorsed, and was required to pay the note, which amount is a claim of Deane's in this suit; that he never paid the full amount of the purchase price of his stock, which balance was carried as an asset, and refused to pay when asked; that the company was reported by Dun & Co. as having no available assets, and he told their manager at the time of sale to Hamilton that the business was not successful, and did not give a statement of assets and liabilities, and said that no other stock could be sold; that a heavy creditor had gone to him, complaining about the claim and asking for payment of the debt. An examination of the annual statements upon which counsel comments as showing a successful business,

taken in connection with the other evidence, shows that they are unreliable, and do not warrant such a conclusion. The record shows that the business was never successful. It was scraping along without capital and without credit, and was insolvent at the time of the transfer to Hamilton. Defendant Bertsch, as president and one of the financial managers of the company, was presumed to have, and the record shows did have, complete knowledge of its failing condition. This is confirmed by the fact that about 90 days after the sale to Hamilton the corporation sent a letter to its creditors, asking for a compromise at 25 per cent., and stating:

"Our tangible assets are practically accounts, face value, $1,800; our debts amount to about $5,500, and creditors can scarcely realize anything, except by an amicable compromise."

This condition the record shows had not changed from the time when Bertsch sold out. Under these circumstances, he sold to Hamilton, agent. The latter admits he was insolvent and purchased as agent to avoid creditors. His status of insolvency is fixed by his own testimony.

Knowledge of Bertsch as to his insolvency also appears. He sold to him as "agent," which to a business man of his experience meant financial irresponsibility. He desired Hamilton to pay for the stock in full, who told him he could not do it. He sold for a cash payment of only $50, and a note for $1,000, payable $100 every three months, secured by the stock. Hamilton was to assume and pay the unpaid balance of $250 on his original purchase, and also pay two notes he had indorsed for the company at the bank, aggregating the sum of $1,100. Hamilton paid $50 cash and the $1,100 at the bank. He never made further payments. Hamilton testifies that these notes were paid with his wife's money, and were taken and held by her as a claim against the company. Bertsch testifies that he was present at the bank, having gone there with Hamilton to see that the notes were taken up.

From the record the court was justified in finding that Bertsch knew of the insolvency of Hamilton. It is apparent that Hamilton was unable to respond, if called upon to pay the balance unpaid on the stock for which Bertsch was liable, and that this was known to Bertsch at the time of the transfer. *McDonald* v. *Dewey*, 202 U. S. 510 (26 Sup. Ct. 731). This knowledge is material as bearing upon the question of fraudulent intent of defendant Bertsch.

In the above case, Mr. Justice Brown, speaking for the court, after discussing and digesting Federal cases bearing upon the question, said:

"We think it a proper deduction from the prior cases, and such we hold to be the law, that the gist of the liability is the fraud implied in selling, with notice of the insolvency of the bank, and with intent to evade the double liability imposed upon the stockholder by the national banking act. In short, the question of liability is largely determinable by the presence or absence of an intent to evade liability. The fact that the sale was made to an insolvent buyer is doubtless additional evidence of the original fraudulent intent, but would not be in itself sufficient to constitute fraud without notice of the insolvency of the bank. The stockholder is not deprived of his right to sell his stock by the fact that the sale is made to an insolvent person, unless it be made with knowledge of the insolvency of the bank. *McDonald* v. *Dewey, supra*, at page 526.

Upon this proposition the court was unanimous, although there was a dissenting opinion upon another question. While this was a Federal case, relative to double liability of a stockholder under the national banking act, it is in point in principle upon the question of fraudulent transfer.

The record shows that this transfer was made to Hamilton without telling him of the insolvent condition of the company; that defendant Deane was not informed of the sale; that defendant Bertsch signed the new certificate of stock issued to Hamilton, and made no transfer of the stock upon the books of the corporation kept for that pur-

pose as required by law. The finding of the circuit court that this transfer to Hamilton by defendant Bertsch was for the purpose of evading liability is fully sustained by the record, and the portion of the decree imposing upon him a liability for the unpaid balance upon his stock was warranted by the record.

The decree of the circuit court is affirmed, with costs in favor of complainant.

OSTRANDER, C. J., and BROOKE, BLAIR, and STONE, JJ., concurred.